Receipt number AUSFCC-11309190

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*******************************************
*
**SAN RAFAEL OPERATIONS, INC.,** *
*
Plaintiff, *
*
v. * Case No. 26-867 T
*
**THE UNITED STATES OF AMERICA,** *
*
Defendant. *
*
*******************************************

## COMPLAINT

Plaintiff San Rafael Operations, Inc. ("San Rafael" or "Plaintiff"), by and through undersigned counsel, brings this Complaint against the United States of America ("Defendant") for the refund of overpaid federal employment taxes, together with interest, and states as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action to recover federal employment taxes it overpaid for the calendar quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, by reason of San Rafael's entitlement to the Employee Retention Credit (the "ERC").

2. San Rafael's entitlement to the ERC is governed by two separate statutory regimes.

a. First, for the calendar quarters ending March 31, 2021, and June 30, 2021 (the "Section 2301 Quarters"), the ERC is governed by Section 2301 of the CARES Act, as amended by Section 207 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (the "Relief Act").

b. Second, for the calendar quarter ending September 30, 2021 (the "Section 3134 Quarter"), the ERC is governed by 26 U.S.C. § 3134.

3. San Rafael is entitled to ERC refunds under both the Section 2301 Quarters and the Section 3134 Quarter, together with statutory interest as provided by law.

4. San Rafael timely filed claims for refund (IRS Forms 941-X) for each of the three quarters at issue (March 31, 2021, June 30, 2021, and September 30, 2021).

5. The Internal Revenue Service (the "IRS") fully disallowed all three of San Rafael's ERC claims.

6. Plaintiff brings this suit within two years of the date the IRS mailed its notices of disallowance (on June 12, 2024), as prescribed by 26 U.S.C. § 6532(a)(1).

7. The total refund sought by Plaintiff for all three quarters is $1,862,044.20, plus interest as allowed by law.

## THE PARTIES

8. Plaintiff, San Rafael Operations, Inc., is a corporation organized under the laws of the State of Texas. It operates San Rafael Nursing and Rehabilitation Center, a 178-bed licensed skilled nursing, rehabilitation, and long-term care facility located at 3050 Sunnybrook Road, Corpus Christi, Texas 78415, providing around-the-clock care to a medically fragile and elderly resident population. San Rafael was incorporated under the laws of the State of Texas on May 18, 2020.

9. Defendant is the United States of America. The IRS is an agency and instrumentality of the United States.

## JURISDICTION

10. This action arises under 26 U.S.C. § 7422(a), which authorizes — only *after* a claim for refund or credit has been filed with the IRS — a civil action for the refund of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any sum alleged to have been wrongfully collected under the internal revenue laws.

11. Plaintiff has satisfied the prerequisites for filing suit under 26 U.S.C. § 7422(a). For each quarter at issue, San Rafael filed a claim for refund on Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, within the period prescribed by 26 U.S.C. § 6511(a). As required by Rule 9(m)(2)(A) of the Rules of the United States Court of Federal Claims, Plaintiff's three separate claims for refund are attached as Exhibit A.

12. The IRS received each of the three claims for refund on October 4, 2022.

13. This action is timely under 26 U.S.C. § 6532(a)(1). More than six months have elapsed between the Plaintiff's filing of its refund claims and the commencement of this action; and this action is brought within two years of the IRS's June 12, 2024, notices of disallowance — presenting a two-year expiration date of June 12, 2026.

14. Plaintiff having satisfied the requirements of 26 U.S.C. § 7422(a) and 26 U.S.C. § 6532(a)(1), jurisdiction before this Court is proper under 28 U.S.C. § 1491(a)(1) and 28 U.S.C. § 1346(a)(1).

15. Plaintiff's identifying statement, required for all tax refund claims by Rule 9(m)(2)(B) of the Rules of the United States Court of Federal Claims, is attached as Exhibit B.

## STATUTORY BACKGROUND

### *The Employee Retention Credit (the ERC)*

16. The ERC is a refundable tax credit against an employer's share of certain federal employment taxes — enacted to assist employers who were affected during the COVID-19 pandemic and nevertheless continued to operate, provide services, and pay their employees.

17. As stated above, the ERC for the Section 2301 Quarters is governed by Section 2301 of the CARES Act (Pub. L. No. 116-136, Mar. 27, 2020), as amended by Section 207 of the Relief Act (Pub. L. No. 116-260, Dec. 27, 2020), and the ERC for the Section 3134 Quarter is governed by Section 3134, added by Section 9651 of the American Rescue Plan Act of 2021 (Pub. L. No. 117-2, Mar. 11, 2021). For the provisions relevant to this action, the two statutory regimes contain materially identical operative language, and the text quoted below from Section 3134 is materially identical to the corresponding text of Section 2301, as amended.

18. For each calendar quarter in 2021, an "eligible employer" is allowed a credit equal to 70 percent of the "qualified wages" paid to each of its employees, taking into account no more than $10,000 of qualified wages per employee for any calendar quarter. *See* 26 U.S.C. § 3134(a), (b)(1); *accord* Section 2301(a) and (b)(1) of the CARES Act, as amended by Section 207 of the Relief Act.

19. If the credit allowed for a calendar quarter exceeds the employer's applicable employment taxes for that quarter, the excess "shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." 26 U.S.C. § 3134(b)(3).

### *Eligible Employers under the ERC*

20. The term "eligible employer" means any employer that was carrying on a trade or business during the calendar quarter for which the ERC applied and that, with respect to that quarter, satisfies any of three alternative tests. *See* 26 U.S.C. § 3134(c)(2)(A). Two of those alternative tests are relevant here:

a. Under the first test, the full or partial suspension of operations test (the "Suspension Test"), an employer is an eligible employer if "the operation of the trade or business . . . is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

b. Under the second test, the decline in gross receipts test (the "Gross Receipts Test"), an employer is an eligible employer if it experienced a decline in gross receipts — that is, if its gross receipts for the calendar quarter were less than 80 percent of its gross receipts for the same calendar quarter in 2019. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II).

21. The IRS has interpreted the Suspension Test to provide that, where a governmental order requires an employer to modify its business operations and the modification has "more than a nominal effect" on those operations, the employer's trade or business is partially suspended for purposes of the ERC. *See* Notice 2021-20, 2021-11 I.R.B. 922, Q&A-17, 18. These suspension rules apply to both the Section 2301 Quarters and the Section 3134 Quarter. *See* Notice 2021-23, 2021-16 I.R.B. 1113; Notice 2021-49, 2021-34 I.R.B. 316.

### *Qualified Wages under the ERC*

22. For an eligible employer whose average number of full-time employees (within the meaning of 26 U.S.C. § 4980H) during 2019 was not greater than 500, "qualified wages" include the wages and compensation, and allocable qualified health plan expenses, paid to its employees

during a calendar quarter in which the employer is an eligible employer. *See* 26 U.S.C. § 3134(c)(3)(A), (D).

### *The Aggregated Single Employer under the ERC*

23. For ERC purposes, the aggregation rules apply — that is, members of a commonly controlled group are treated as a "single employer." Section 3134(d) provides: "All persons treated as a single employer under subsection (a) or (b) of section 52, or subsection (m) or (o) of section 414, shall be treated as one employer for purposes of this section." The predecessor provision, Section 2301(d) of the CARES Act, contains identical language.

### *The Decline in Gross Receipts*

24. For ERC purposes, an employer experiences a decline in gross receipts for any calendar quarter in 2021 if "the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019." 26 U.S.C. § 3134(c)(2)(A)(ii)(II); *accord* Section 2301(c)(2)(A)(ii)(II) of the CARES Act, as amended by Section 207 of the Relief Act.

25. An ERC eligible employer may elect to determine the decline in gross receipts for a calendar quarter by comparing its gross receipts for the immediately preceding calendar quarter to its gross receipts for the corresponding calendar quarter in 2019. *See* 26 U.S.C. § 3134(c)(2)(B); *accord* Section 2301(c)(2)(B) of the CARES Act, as amended by Section 207 of the Relief Act.

26. The statute also addresses employers not in existence in 2019, providing: "With respect to any employer for any calendar quarter, if such employer was not in existence as of the beginning of the same calendar quarter in calendar year 2019, clause (ii)(II) shall be applied by

substituting '2020' for '2019.'" 26 U.S.C. § 3134(c)(2)(A); *accord* Section 2301(c)(2)(A) of the CARES Act, as amended by Section 207 of the Relief Act.

## STATEMENT OF FACTS

### *San Rafael and the Single Employer Aggregated Group*

27. Throughout the quarters at issue, San Rafael operated its 178-bed skilled nursing, rehabilitation, and long-term care facility continuously and in person. The skilled nursing care and medical treatment it provides require around-the-clock, on-site staffing and the physical presence of caregivers and specially trained medical professionals. Its residents depended on the facility for continuous medical and custodial care, and San Rafael remained open and operating to deliver that care throughout the COVID-19 pandemic.

28. At all times relevant to this action, and for ERC purposes, San Rafael was a member of a larger group of entities under common control that are treated as a single employer under Section 3134(d) and the predecessor provision of Section 2301(d) of the CARES ACT (hereinafter, the "Aggregated Group").

29. The members of the Aggregated Group included, among others, VGM Valley Grande Manor Weslaco Ops, Inc.; North TX Ops (Rose Trail); Tyler Ops LTC, Inc.; Pilot Point Care, Inc.; Tyler Rehab & Care, Inc.; Oak Park Operations; San Rafael Operations, Inc.; and TDT Bilal Opco I LLC — all facilities located in the State of Texas.

30. VGM Valley Grande Manor Weslaco Ops, Inc., one member of the Aggregated Group, was in existence and operated a skilled nursing facility as of the beginning of the first calendar quarter of 2019 and throughout calendar year 2019.

31. The collective Aggregated Group was in existence, and had gross receipts, in each calendar quarter of 2019.

***The Aggregated Group's Decline in Gross Receipts***

32. Determined on a single employer aggregated-group basis using 2019 as the comparison year, upon information and belief, the Aggregated Group's total gross receipts for the calendar quarters ending June 30, 2021, and September 30, 2021, were each less than 80 percent of the Aggregated Group's total gross receipts for the corresponding calendar quarters of 2019.

***The Aggregated Group's Qualified Wages***

33. The Aggregated Group's average number of full-time employees (within the meaning of 26 U.S.C. § 4980H) during 2019 was not greater than 500.

34. San Rafael paid qualified wages, including allocable qualified health plan expenses, to its employees during each of the calendar quarters ending March 31, June 30, and September 30, 2021.

35. None of the wages San Rafael claimed as qualified wages for the ERC were taken into account as payroll costs for forgiveness of any Paycheck Protection Program loan, were paid to any individual described in 26 U.S.C. § 51(i) or were taken into account for any other credit that would preclude their treatment as qualified wages for ERC purposes.

***Governmental Orders Affecting the Aggregated Group's Operations and Licensure***

36. During the quarters at issue, San Rafael and the other members of the Aggregated Group operated their skilled nursing facilities subject to orders of federal, state, and local governmental authorities directed at controlling the spread of COVID-19 in long-term care facilities

(the "Orders"). Compliance with the Orders of the main regulatory bodies listed below was a condition of each facility's continued licensure, participation in the Medicare and Medicaid programs, and payment for services:

a. At the federal level, the Centers for Medicare & Medicaid Services and the Centers for Disease Control and Prevention imposed, among others, binding infection-control and operational requirements on participating skilled nursing facilities;

b. At the state level, the Texas Health and Human Services Commission ("HHSC") issued mandatory directives governing the operation of every licensed nursing facility in the State of Texas, including San Rafael's facility in Corpus Christi; and

c. At the local level, county and municipal public health authorities imposed further requirements, which in certain jurisdictions — including Bexar County, where the San Antonio Metropolitan Health District ("Metro Health") regulated the Aggregated Group's San Antonio facility — were more stringent still.

37. The Orders required San Rafael and the other members of the Aggregated Group to fundamentally modify the operation of their facilities in numerous respects that, individually and in the aggregate, had more than a nominal effect on those operations, as set forth in paragraphs 38 through 43.

38. ***Mandatory Cohorting and Dedicated Isolation Units.*** The Orders required the members of the Aggregated Group to segregate residents according to COVID-19 status — separating COVID-negative residents ("cold" zone), residents under observation for exposure or symptoms ("warm" zone), and COVID-positive residents ("hot" zone). The members were required to maintain physical separation (e.g., erect barriers) between the zones and the remainder of the facility, to assign staff who could work only within a single designated zone, to prohibit the placement of residents from different zones together, and to dedicate a portion of each facility's beds to this isolation cohorting. These requirements deprived the members of the ordinary

flexibility to admit and place residents throughout the facility, reducing the capacity at which each facility could operate.

39. ***Mandatory Closures to New Admissions.*** The Orders required the members of the Aggregated Group to suspend all new admissions upon the identification of a COVID-positive case within a facility, and prohibited the resumption of admissions until the facility satisfied a rigorously defined reopening protocol — including, in part, a continuous period with no new resident cases, universal testing of residents and staff, and written clearance from the governing health authority. As a result, the members were repeatedly closed to new admissions during the quarters at issue, preventing them from admitting and serving residents they otherwise would have served.

40. ***Mandatory Staffing Restrictions and Reliance on Outside Agencies.*** Beyond confining staff to designated zones, the Orders — in certain jurisdictions — prohibited staff from working in more than one facility and required any staff member exposed to or infected with COVID-19 to be excluded from the workplace entirely for extended periods. The members could no longer maintain required staffing levels internally with their own personnel. For the first time in the operating history of the Aggregated Group, they were forced to engage outside temporary staffing agencies simply to meet mandatory minimum staffing requirements.

41. ***Mandatory Modification of Communal Services and In-Room Care.*** Skilled nursing and long-term care facilities are, by design and by licensure, congregate care settings. The Orders, however, required the members of the Aggregated Group to suspend communal dining and group activities, to restrict in-person family visitation, and to deliver meals, therapy, and other services to isolated residents individually within their rooms. These requirements fundamentally

altered the congregate, communal model of care that defines this setting, converting it into one of individualized, room-by-room isolation.

42. ***Mandatory Testing, Screening, and Protective Measures.*** The Orders required the members of the Aggregated Group to conduct routine and outbreak testing of residents and staff, to screen and monitor persons entering the facilities, to exclude any symptomatic or exposed individuals, to require — without exception — enhanced personal protective equipment for the provision of routine care, and to report COVID-19 data continuously to multiple governmental authorities. These requirements materially altered the conditions under which, and the manner in which, the members were permitted to operate their facilities.

43. ***Diversion of Administrative and Operational Resources.*** Beyond their direct effect on resident care, the Orders required the members of the Aggregated Group to divert and reallocate substantial administrative, supervisory, and operational resources away from the ordinary conduct of their business — including resources devoted to monitoring and documenting compliance, conducting and tracking testing, reporting data to multiple governmental authorities, procuring and managing protective equipment and supplies, and continually reconfiguring staffing and operations to meet the evolving mandatory requirements. These burdens fell on every member of the Aggregated Group throughout the quarters at issue.

***San Rafael's Refund Claims and the IRS's Examination and Full Disallowance***

44. San Rafael timely filed an original Form 941, *Employer's Quarterly Federal Tax Return*, for each of the calendar quarters at issue, and paid all amounts shown as due thereon.

45. San Rafael thereafter filed a Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, for each of the calendar quarters at issue, claiming a refund based on

the ERC in the amount of $625,512.71 for the first quarter, $599,044.89 for the second quarter, and $637,486.60 for the third quarter of 2021.

46. Subsequently, the IRS examined San Rafael's Forms 941-X and its ERC claims — which the IRS initiated by Letter 3850 dated August 7, 2023.

47. During the examination, the IRS determined that the members of the Aggregated Group are treated as a "single employer" for purposes of the ERC under Section 3134(d) and predecessor Section 2301(d) of the CARES Act, by reason of 26 U.S.C. §§ 52 and 414.

48. During the examination, San Rafael provided the IRS a computation of the Aggregated Group's total combined gross receipts for the quarters at issue and for the corresponding quarters of 2019, determined on a single employer aggregated-group basis using 2019 as the comparison year.

49. The IRS's own examination workpapers contained the gross receipts of each member of the Aggregated Group for every quarter of 2019, 2020, and 2021 — the data necessary to compute and compare the Aggregated Group's combined gross receipts for each quarter at issue.

50. In evaluating whether the Aggregated Group satisfied the Gross Receipts Test, the IRS did not determine the Aggregated Group's eligibility on a single employer aggregated-group basis using 2019 as the comparison year. Instead, as to each member of the Aggregated Group that the IRS treated as not in existence in the corresponding quarter of 2019, the IRS applied the comparison by substituting 2020 for 2019 and evaluated that individual member's gross receipts on a separate, member-by-member basis.

51. By Letter 5376, dated November 7, 2023, and an accompanying Form 886-A, the IRS proposed to disallow all of San Rafael's ERC claims for all three quarters.

52. On December 14, 2023, San Rafael timely protested the proposed disallowances and requested consideration by the IRS Independent Office of Appeals, disputing the disallowances on the grounds that San Rafael's operations were partially suspended by mandatory governmental orders and that the Aggregated Group — a single employer — satisfied the Gross Receipts Test.

53. By three notices of disallowance, each on IRS Letter 1364 and each mailed June 12, 2024, the IRS Independent Office of Appeals sustained the examination findings and fully disallowed San Rafael's refund claims for the three quarters at issue.

54. Each notice of disallowance stated, as the reason for the disallowance, that although governmental guidance existed concerning the reduction of the spread of COVID-19 in nursing homes, that guidance did not suspend or affect San Rafael's operations more than nominally.

55. Although San Rafael presented the Gross Receipts Test and its supporting computations to the IRS during the examination and in its Appeals protest, the notices of disallowance addressed only the Suspension Test and did not address whether the Aggregated Group satisfied the Gross Receipts Test.

56. San Rafael has paid all applicable employment taxes for each of the calendar quarters at issue and the ERC to which San Rafael is entitled for each such quarter exceeds those applicable employment taxes, resulting in an overpayment that the IRS has refused to refund.

## CLAIMS FOR RELIEF

## COUNT I

***Refund of Overpaid Employment Taxes for First Quarter 2021 (a Section 2301 Quarter) — Basis for Eligibility: The Suspension Test***

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56.

58. The ERC for the calendar quarter ending March 31, 2021, is governed by Section 2301 of the CARES Act, as amended by Section 207 of the Relief Act.

59. San Rafael was an eligible employer for the calendar quarter ending March 31, 2021, if, with respect to that quarter, it carried on a trade or business and *either* (1) had its operations partially suspended by governmental order or (2) experienced a decline in gross receipts. *See* Section 2301(c)(2)(A) of the CARES Act, as amended by Section 207 of the Relief Act.

60. San Rafael carried on a trade or business during the quarter ending March 31, 2021.

61. For purposes of the ERC, San Rafael and the other members of the Aggregated Group are treated as a single employer under the ERC aggregation rules. *See* Section 2301(d) of the CARES Act.

62. San Rafael paid qualified wages during the quarter ending March 31, 2021, and the average number of full-time employees of the Aggregated Group during 2019 was not greater than 500.

63. The operation of the Aggregated Group's trade or business was partially suspended during the quarter ending March 31, 2021, by orders of appropriate governmental authorities that had more than a nominal effect on its operations, as separately stated in paragraphs 36 through 43.

64. San Rafael therefore satisfies the Suspension Test for the quarter ending March 31, 2021. *See* Section 2301(c)(2)(A)(ii)(I) of the CARES Act, as amended by Section 207 of the Relief Act.

65. San Rafael is entitled to an Employee Retention Credit of $625,512.71 for the quarter ending March 31, 2021, which exceeds its applicable employment taxes for that quarter and

constitutes an overpayment refundable under Section 2301 of the CARES Act and 26 U.S.C. §§ 6402(a) and 6413(b).

66. The IRS erroneously disallowed San Rafael's claim for the quarter ending March 31, 2021, and Plaintiff is entitled to a refund of $625,512.71, plus interest as allowed by law.

## COUNT II

***Refund of Overpaid Employment Taxes for Second Quarter 2021 (a Section 2301 Quarter) — Basis for Eligibility: The Suspension Test & Gross Receipts Test***

67. San Rafael realleges and incorporates by reference paragraphs 1 through 66.

68. The ERC for the calendar quarter ending June 30, 2021, is governed by Section 2301 of the CARES Act, as amended by Section 207 of the Relief Act.

69. San Rafael was an eligible employer for the calendar quarter ending June 30, 2021, if, with respect to that quarter, it carried on a trade or business and *either* (1) had its operations partially suspended by governmental order or (2) experienced a decline in gross receipts. *See* Section 2301(c)(2)(A) of the CARES Act, as amended by Section 207 of the Relief Act.

70. San Rafael carried on a trade or business during the quarter ending June 30, 2021.

71. For purposes of the ERC, San Rafael and the other members of the Aggregated Group are treated as a single employer under the ERC aggregation rules. *See* Section 2301(d) of the CARES Act.

72. San Rafael paid qualified wages during the quarter ending June 30, 2021, and the average number of full-time employees of the Aggregated Group during 2019 was not greater than 500.

73. The operation of the Aggregated Group's trade or business was partially suspended during the quarter ending June 30, 2021, by orders of appropriate governmental authorities that had more than a nominal effect on its operations, as separately stated in paragraphs 36 through 43.

74. San Rafael therefore satisfies the Suspension Test for the quarter ending June 30, 2021. *See* Section 2301(c)(2)(A)(ii)(I) of the CARES Act, as amended by Section 207 of the Relief Act.

75. In the alternative, the Aggregated Group was in existence as of the beginning of the calendar quarter ending June 30, 2019, and the comparison quarter for the Aggregated Group is therefore the second calendar quarter of 2019, ending June 30, 2019.

76. Upon information and belief, and determined on an aggregated-group basis using the second calendar quarter of 2019 as the comparison quarter, the Aggregated Group's gross receipts for the quarter ending June 30, 2021, were less than 80 percent of its gross receipts for the quarter ending June 30, 2019 (see paragraph 32).

77. San Rafael therefore satisfies the Gross Receipts Test for the quarter ending June 30, 2021. *See* Section 2301(c)(2)(A)(ii)(II) of the CARES Act, as amended by Section 207 of the Relief Act.

78. San Rafael is entitled to an Employee Retention Credit of $599,044.89 for the quarter ending June 30, 2021, which exceeds its applicable employment taxes for that quarter and constitutes an overpayment refundable under Section 2301 of the CARES Act and 26 U.S.C. §§ 6402(a) and 6413(b).

79. The IRS erroneously disallowed San Rafael's claim, and Plaintiff is entitled to a refund of $599,044.89, plus interest as allowed by law.

## COUNT III

***Refund of Overpaid Employment Taxes for Third Quarter 2021 (the Section 3134 Quarter) — Basis for Eligibility: The Suspension Test & Gross Receipts Test***

80. San Rafael realleges and incorporates by reference paragraphs 1 through 79.

81. The ERC for the calendar quarter ending September 30, 2021, is governed by 26 U.S.C. § 3134.

82. San Rafael was an eligible employer for the calendar quarter ending September 30, 2021, if, with respect to that quarter, it carried on a trade or business and *either* (1) had its operations partially suspended by governmental order or (2) experienced a decline in gross receipts. *See* 26 U.S.C. § 3134(c)(2)(A).

83. San Rafael carried on a trade or business during the quarter ending September 30, 2021.

84. For purposes of the ERC, San Rafael and the other members of the Aggregated Group are treated as a single employer under the ERC aggregation rules. *See* 26 U.S.C. § 3134(d).

85. San Rafael paid qualified wages during the quarter ending September 30, 2021, and the average number of full-time employees of the Aggregated Group during 2019 was not greater than 500.

86. The operation of the Aggregated Group's trade or business was partially suspended during the quarter ending September 30, 2021, by orders of appropriate governmental authorities that had more than a nominal effect on its operations, as separately stated in paragraphs 36 through 43.

87. San Rafael therefore satisfies the Suspension Test for the quarter ending September 30, 2021. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

88. In the alternative, the Aggregated Group was in existence as of the beginning of the calendar quarter ending September 30, 2019, and the comparison quarter for the Aggregated Group is therefore the third calendar quarter of 2019, ending September 30, 2019.

89. Upon information and belief, and determined on an aggregated-group basis using the third calendar quarter of 2019 as the comparison quarter, the Aggregated Group's gross receipts for the quarter ending September 30, 2021, were less than 80 percent of its gross receipts for the quarter ending September 30, 2019 (*see* paragraph 32).

90. San Rafael therefore satisfies the Gross Receipts Test for the quarter ending September 30, 2021. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II).

91. San Rafael is entitled to an Employee Retention Credit of $637,486.60 for the quarter ending September 30, 2021, which exceeds its applicable employment taxes for that quarter and constitutes an overpayment refundable under 26 U.S.C. §§ 3134(b)(3), 6402(a), and 6413(b).

92. The IRS erroneously disallowed San Rafael's claim, and Plaintiff is entitled to a refund of $637,486.60, plus interest as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant, the United States of America, and award the following relief:

A. A refund in the aggregate amount of $1,862,044.20, or such greater amount as may be established at trial or otherwise allowed by law, together with interest as allowed by law, which is comprised of the following:

i. On Count I, a refund of Plaintiff's overpaid federal employment taxes for the calendar quarter ending March 31, 2021, in the amount of $625,512.71, plus interest as allowed by law;

ii. On Count II, a refund of Plaintiff's overpaid federal employment taxes for the calendar quarter ending June 30, 2021, in the amount of $599,044.89, plus interest as allowed by law;

iii. On Count III, a refund of Plaintiff's overpaid federal employment taxes for the calendar quarter ending September 30, 2021, in the amount of $637,486.60, plus interest as allowed by law;

B. Plaintiff's reasonable litigation and administrative costs, including attorneys' fees, pursuant to 26 U.S.C. § 7430; and

C. Such other and further relief as the Court deems just and proper.

Dated: June 12, 2026.

Respectfully submitted,

SOLLERTIS

/s/ Jason A. Morton

Jason A. Morton
N.C. Bar No. 37357

SOLLERTIS
4131 N. Central Expressway, Suite 987
Dallas, Texas 75204
Telephone: (214) 241-1211
Email: jmorton@sollertis.com

*Counsel for Plaintiff San Rafael Operations, Inc.*